**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

**U.S. BANK NATIONAL ASSOCIATION,** *as*
*Trustee for the Registered Holders of J.P. Morgan*
*Chase Commercial Mortgage Securities Corp.,*
*Multifamily Mortgage Pass-Through Certificates,*
*Series 2018-KX03,*

                               **Plaintiff,**

    vs.                                    **3:23-cv-928**
                                              **(MAD/ML)**

**CHENANGO PLACE, LLC; RACHEL SCHIFF;**
**ABRAHAM GROSS; and BROOME COUNTY**
**INDUSTRIAL DEVELOPMENT AGENCY,**

                             **Defendants.**
_____

| | |
|---|---|
| **APPEARANCES:** | **OF COUNSEL:** |
| **BALLARD SPAHR LLP** | **MARJORIE J. PEERCE, ESQ.** |
| 1675 Broadway – 19th Floor | **CELIA A. COHEN, ESQ.** |
| New York, New York 10019-5820 | **RAYMOND A. QUAGLIA, ESQ.** |
| Attorneys for Plaintiff | |
| | |
| **HINMAN, HOWARD & KATTELL, LLP** | **HARVEY D. MERVIS, ESQ.** |
| P.O. Box 5250 | **ALBERT J. MILLUS, JR., ESQ.** |
| 80 Exchange Street | |
| 700 Security Mutual Building | |
| Binghamton, New York 13902-5250 | |
| Attorneys for Defendants Chenango Place, LLC, | |
| Rachel Schiff, and Abraham Gross | |

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

Plaintiff-Lender U.S. Bank National Association ("Plaintiff" or "Lender") commenced this

action on August 31, 2023, seeking to foreclose a commercial mortgage on which Defendant-

Borrower Chenango Place, LLC ("Borrower") has been in default. *See* Dkt. No. 1. The mortgage

encumbers Borrower's property at 7-9 Court Street, Binghamton, New York, and secures payment of the amounts due under the promissory note made by Borrower in the principal amount of $12,975,000.00.  *See id.*

Currently before the Court is Plaintiff's motion for summary judgment, which Defendants Borrower, Rachel Schiff, and Abraham Gross have not opposed.  *See* Dkt. No. 68.  Also before the Court is Plaintiff's motion for default judgment as to Defendant Broome County Industrial Development Agency, which is also unopposed.  *See* Dkt. No. 44.

## II. BACKGROUND

### A.    The Parties

Plaintiff U.S. Bank National Association is a national banking association with its main office, as designated in its Articles of Association, located in Cincinnati, Ohio.  *See* Dkt. No. 68-1 at ¶ 1.  Defendant-Borrower Chenango Place, LLC is a New York limited liability company, whose members are Abraham Gross (managing member), Rachel Schiff, Feigel Herskovitz, Isaac Herskovitz, Isaac Greenfeld, Isaac Weiss, and Meilech Schlafrig, all of whom are citizens of New York, and none of whom is a citizen of Ohio.  *See id.* at ¶ 2.  Defendants Rachel Schiff and Abraham Gross (together, "Guarantors") are individuals who reside in Brooklyn, New York, and are citizens of New York.  *See id.* at ¶ 3.  Defendant Broome County Industrial Development Agency (the "Agency") is a public benefit corporation existing under the laws of New York with its offices in Binghamton, New York.  *See id.* at ¶ 4.

### B.    The Original Loan Transaction

Borrower is the owner of the improved real property located at 7-9 Court Street, Binghamton, New York 13901 (the "Property"), which is operated as the student housing complex commonly known as Chenango Place.  *See id.* at ¶ 5.  Borrower leases the Property to

the Agency pursuant to a Lease Agreement dated December 30, 2014.  *See id.* at ¶ 6.  The Agency leases the Property back to Borrower pursuant to a Leaseback Agreement dated December 30, 2014.  *See id.* at ¶ 7.

Arbor Commercial Mortgage, LLC ("Original Lender") issued the Loan to Borrower on or about March 28, 2016.  *See id.* at ¶ 8.  The Loan is evidenced by a Consolidated, Amended and Restated Multifamily Note in the principal amount of $12,975,000.00, effective as of March 28, 2016, which consolidated certain pre-existing promissory notes executed by Borrower.  *See id.* at ¶ 9.  To secure repayment on the Note, Borrower and the Agency executed in favor of the Original Lender a Multifamily Mortgage, Assignment of Rents and Security Agreement effective as of March 28, 2016 (the "Mortgage").  *See id.* at ¶ 10.  The Consolidation Agreement consolidated, restated and amended in their entirety certain pre-existing mortgages to create a single first-priority mortgage lien with respect to the Property.  *See id.* at ¶ 11.

The Consolidation Agreement was recorded with the Broome County Clerk (the "Clerk") on April 19, 2016, as Instrument No. 201600010404 in Book M3768, page 1390.  *See id.* at ¶ 12. Borrower and the Original Lender also entered into a Multifamily Loan and Security Agreement dated as of March 28, 2016 (the "Loan Agreement").  *See id.* at ¶ 13.  As further inducement for the Original Lender to make the Loan, Guarantors executed in favor of the Original Lender a Guaranty effective as of March 28, 2016 (the "Guaranty").  *See id.* at ¶ 14.[1]

## C.    The Assignments of the Loan

### 1. The First Loan Assignment

---

[1] The Note, the Consolidation Agreement, the Mortgage, the Loan Agreement, the Guarantee and various other documents executed by Borrower and/or Guarantors in favor of the Original Lender with respect to the Loan are collectively referred to herein as the "Loan Documents."

The Original Lender assigned the Loan to the Federal Home Loan Mortgage Corporation ("FHLMC") (the "First Loan Assignment"). *See* Dkt. No. 68-1 at ¶ 15. In connection with the First Loan Assignment, the Original Lender endorsed and physically delivered the Note to FHLMC. *See id.* at ¶ 16. Also in connection with the First Loan Assignment, the Original Lender executed in favor of FHLMC an Assignment of Consolidated Security Instruments, which was recorded with the Clerk on April 19, 2016, as Instrument No. 2016000010405 in Book M3768, page 1455. *See id.* at ¶ 17. Additionally, the Original Lender executed in favor of FHLMC an Omnibus Assignment effective March 28, 2016, by which the Original Lender assigned to FHLMC, among other things, "all of the right, title and interest of Assignor in, to, and under the documents listed in Exhibit A attached hereto," including the Loan Agreement and the Guaranty. *See id.* at ¶ 18. FHLMC perfected its lien and security interest in the Personalty via a UCC-1 Financing Statement, which was filed with the New York Department of State (the "Department") on April 13, 2016, as Filing No. 201604130173081. *See id.* at ¶ 19.

### 2. The Securitization and Assignment of the Loan to Lender

Section 11.13 of the Loan Agreement, entitled "Lender's Rights to Sell or Securitize," provides that "Lender, and each successor to Lender's interest, may (without prior Notice to Borrower or Borrower's prior consent) ... securitize the Loan or place the Loan in a trust." Dkt. No. 68-1 at ¶ 20. Securitization is when a number of commercial mortgages or other cash flow-producing assets are pooled together in a trust to create securities that are sold to investors and pay a predictable rate of return. *See id.* at ¶ 21. In May 2018, the Loan was securitized and pooled together with a number of other commercial mortgage loans in a trust called the J.P. Morgan Chase Commercial Mortgage Securities Corp., Multifamily Mortgage Pass-Through Certificates, Series 2018-KX03 (the "Trust"). *See id.* at ¶ 22.

4

The terms of the subject securitization and roles of the various Trust parties are set forth in a Pooling and Servicing Agreement dated as of May 1, 2018 (the "PSA"). *See id.* at ¶ 23. In connection with the securitization and assignment of the Loan to Lender, FHLMC physically delivered the original Note to Lender and executed in favor of Lender an Allonge dated May 25, 2018, which was firmly affixed to the Note. *See id.* at ¶ 24. Also in connection with the securitization and assignment of the Loan to Lender, FHLMC executed in favor of Lender an Assignment of Mortgage effective as of May 25, 2018. *See id.* at ¶ 25. FHLMC also assigned its interest in the Personalty to Lender via a UCC-3 Amendment, which was filed with the Department on July 20, 2023, as Filing No. 202307200273774. *See id.* at ¶ 26. By virtue of the foregoing, Lender has been the owner and holder of the Note, the Mortgage and the other Loan Documents since at least May 25, 2018. *See id.* at ¶ 27.

**D.      Borrower's Maturity Default**

The Note provides for specified payments of interest and/or principal over time and requires that "[a]ll remaining Indebtedness, including all principal and interest, will be due and payable by Borrower on the Maturity Date," which was to occur no later than the Stated Maturity Date of April 1, 2023. *See* Dkt. No. 68-1 at ¶ 28. Section 9.01(a) of the Loan Agreement provides that an Event of Default shall occur if "Borrower fails to pay or deposit when due any amount required by the Note, this Loan Agreement or any other Loan Document." *Id.* at ¶ 29. Borrower did not pay the remaining Indebtedness due on the Loan on the Maturity Date of April 1, 2023. *See id.* at ¶ 30. Borrower's failure to pay the remaining Indebtedness due on the Loan on or before the Maturity Date of April 1, 2023, constitutes a defined Event of Default under Section 9.01(a) of the Loan Agreement. *See id.* at ¶ 31.

Borrower's maturity default caused the servicing of the Loan to be transferred from the Master Servicer, FHLMC, to the Special Servicer with respect to the Fixed Loan Group, which was at that time Midland Loan Services, a division of PNC Bank, National Association ("Midland"), in or around June 2023. *See id.* at ¶ 32. Lender, through Midland, provided a Notice of Default and Intent of Foreclosure to Borrower by letter dated April 18, 2023 (the "Notice of Default"). *See id.* at ¶ 33. The Notice of Default notified Borrower that "[y]ou are in default under the Loan Documents for failure to pay the loan in full at the April 1, 2023 maturity date." *Id.* at ¶ 34. The Notice of Default further advised Borrower that "[f]ailure to cure the default as noticed by May 2, 2023 will result in Midland, on behalf of Lender, pursuing all remedies available under the Loan Documents." *Id.* at ¶ 35.

Notwithstanding the Notice of Default, Borrower has failed to cure the ongoing Event of Default by paying in full the amounts due on the Loan. *See id.* at ¶ 36. The Mortgage provides that, "[a]t any time during the existence of an Event of Default, Lender," among other things, "may foreclose this Instrument by judicial or nonjudicial proceedings." *Id.* at ¶ 37. KeyBank replaced Midland as Special Servicer for the Loan effective July 5, 2024. *See id.* at ¶ 38.

### E.    Borrower's Post-Maturity Partial Payments

Between June 13, 2023, and January 9, 2024, after the occurrence and during the continuance of the Event of Default, Borrower made a number of payments to Lender on the Loan. *See* Dkt. No. 68-1 at ¶ 39. Borrower's post-maturity payments were individually and collectively insufficient to satisfy the Indebtedness due on the Loan. *See id.* at ¶ 40.

Section 4 of the Note, entitled "Application of Partial Payments," provides as follows:

> If at any time Lender receives, from Borrower or otherwise, any amount applicable to the Indebtedness which is less than all amounts due and payable at such time, Lender may apply the amount received to amounts then due and payable in any manner

6

> and in any order determined by Lender, in Lender's discretion.
> Borrower agrees that neither Lender's acceptance of a payment
> from Borrower in an amount that is less than all amounts then due
> and payable nor Lender's application of such payment will
> constitute or be deemed to constitute either a waiver of the unpaid
> amounts or an accord and satisfaction.

*Id.* at ¶ 41.

Section 2.04 of the Loan Agreement, entitled "Application of Payments," provides as follows:

> If at any time Lender receives, from Borrower or otherwise, any
> amount applicable to the Indebtedness which is less than all
> amounts due and payable at such time, then Lender may apply that
> payment to amounts then due and payable in any manner and in any
> order determined by Lender (unless otherwise required by
> applicable law), in Lender's sole and absolute discretion. Neither
> Lender's acceptance of an amount that is less than all amounts then
> due and payable, nor Lender's application of such payment in the
> manner authorized, will constitute or be deemed to constitute either
> a waiver of the unpaid amounts or an accord and satisfaction.
> Notwithstanding the application of any such amount to the
> Indebtedness, Borrower's obligations under this Loan Agreement,
> the Note and all other Loan Documents will remain unchanged.

*Id.* at ¶ 42.

Section 14 of the Note, entitled "Forbearance," provides in part that "[t]he acceptance by Lender of any payment after the due date of such payment, or in an amount which is less than the required payment, will not be a waiver of Lender's right to require prompt payment when due of all other payments or to exercise any right or remedy with respect to any failure to make prompt payment." *Id.* at ¶ 43. Section 9.04(b) of the Loan Agreement provides that "[t]he acceptance by Lender of payment of all or any part of the Indebtedness after the due date of such payment, or in an amount which is less than the required payment, will not be a waiver of Lender's right to require prompt payment when due of all other payments on account of the Indebtedness or to exercise any remedies for any failure to make prompt payment." *Id.* at ¶ 44.

**F.    Lender's Damages**

Accounting for all payment received on the Loan, Plaintiff claims that the total amount due and owing on the Loan as of November 1, 2024, is $13,328,884.18, itemized as follows:

| | |
|---|---|
| Principal Balance | $11,730,325.56 |
| Interest (1/1/24 – 10/30/24) | $463,326.68 |
| Default Interest (4/1/23 – 10/30/24) | $761,009.21 |
| Liquidation Fee (1% of Liquidation Proceeds) | $132,995.82 |
| Special Servicing Fees | $9,567.82 |
| Legal Fees – KeyBank | $104,933.56 |
| Legal Fees – Midland | $21,458.76 |
| Protective Advances | $179,105.53 |
| Interest on Advances | $28,784.09 |
| Inspection Fee – Midland | $220.73 |
| NSF Fees | $100.00 |
| Processing Fee | $750.00 |
| Less Credit – Replacement Reserve | ($103,693.58) |
| TOTAL AMOUNT DUE as of 11/1/2024 | $13,328,884.18 |

Dkt. No. 68-1 at ¶ 45.

Lender is entitled to collect interest pursuant to Section 3(a) of the Note, which provides that "[i]nterest will accrue on the outstanding principal balance of this Note at the Fixed Interest Rate," which "means the annual interest rate of **4.70%**." *Id.* at ¶ 46.  Section 3(b) of the Note provides that:

> Interest under this Note will be computed, payable and allocated on the basis of an actual/360 interest calculation schedule (interest is payable for the actual number of days in each month, and each month's interest is calculated by multiplying the unpaid principal amount of this Note as of the first day of the month for which interest is being calculated by the Fixed Interest Rate, dividing the product by 360, and multiplying the quotient by the number of days in the month for which interest is being calculated).

*Id.* at ¶ 47.  Additionally, Lender is entitled to collect default interest pursuant to Section 8(b) of the Note, which provides that, "[f]rom and after the Maturity Date, the unpaid principal balance will continue to bear interest at the Default Rate until and including the date on which the entire principal balance is paid in full." *Id.* at ¶ 48.  The Default Rate "means an annual interest rate equal to 4 percentage points above the Fixed Interest Rate." *Id.* at ¶ 49.

Moreover, Lender is entitled to recover all of its expenses, including reasonable attorneys' fees, pursuant to Section 13 of the Note ("Costs and Expenses"), which provides:

> To the fullest extent allowed by applicable law, Borrower must pay all expenses and costs, including Attorneys' Fees and Costs incurred by Lender as a result of any default under this Note or in connection with efforts to collect any amount due under this Note, or to enforce the provisions of any of the other Loan Documents, including those incurred in post judgment collection efforts and in any bankruptcy proceeding (including any action for relief from the automatic stay of any bankruptcy proceeding) or judicial or non-judicial foreclosure proceeding.

*Id.* at ¶ 50.

Pursuant to Section 3.11(b)(v) of the PSA,

> [a]s compensation for its activities hereunder, the Special Servicer shall also be entitled to a Liquidation Fee which will be payable to the Special Servicer with respect to each Specially Serviced Loan or REO Loan as to which the Special Servicer receives any Liquidation Proceeds or other amounts set forth in the definition of Liquidation Fee, subject to the exceptions set forth in the definition of Liquidation Fee.  As to each Specially Serviced Loan or REO Loan, the Liquidation Fee will be payable out of, and will be calculated by application of a "Liquidation Fee Rate" of 1.0% of

9

> Liquidation Proceeds and other amounts received with respect to
> such Specially Serviced Loan or REO Loan.

*Id.* at ¶ 51.  Additionally, Section 3.11(b)(i) of the PSA provides as follows:

> As compensation for its activities hereunder, the Special Servicer
> shall be entitled to the Special Servicing Fee with respect to each
> Specially Serviced Loan and REO Loan.  As to each such Specially
> Serviced Loan and REO Loan, the Special Servicing Fee shall
> accrue at the Special Servicing Fee Rate (calculated in accordance
> with the same terms of the related Note as are applicable to the
> accrual of interest at the Mortgage Rate) and shall be computed on
> the basis of the Stated Principal Balance of such Specially Serviced
> Loan and for the same period respecting which any related interest
> payment due on such Specially Serviced Loan or deemed to be due
> on such REO Loan is computed.

*Id.* at ¶ 52.  The "Special Servicing Fee" means, "[w]ith respect to each Specially Serviced Loan

and REO Loan, the fee payable to the Special Servicer pursuant to <u>Section 3.11(b)(i)</u>, computed

on the basis of the Stated Principal Balance of the related Loan and for the same period for which

any related interest payment on the related Specially Serviced Loan is computed, as more

particularly described in <u>Section 3.11(b)(i)</u>." *Id.* at ¶ 53.  The "Special Servicing Fee Rate" means,

"[w]ith respect to each Specially Serviced Loan and REO Loan, 0.25000% *per annum*." *Id.* at ¶

54.

The protective advances comprise amounts advanced by Lender for the protection and

preservation of the Property, which includes $45,923.85 for taxes and $45,760.40 for insurance

premiums.  *See id.* at ¶ 55.

### III. DISCUSSION

A.    **Plaintiff's Motion for Summary Judgment**

   *1. Mortgage Foreclosure*

A court may grant a motion for summary judgment only if it determines that there is no

genuine issue of material fact to be tried and that the facts as to which there is no such issue

warrant judgment for the movant as a matter of law.  *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted).  When analyzing a summary judgment motion, the court "'cannot try issues of fact; it can only determine whether there are issues to be tried.'"  *Id.* at 36-37 (quotation and other citation omitted).  Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 258 (1986).  In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party.  *See Chambers*, 43 F.3d at 36 (citing *Anderson*, 477 U.S. at 255) (other citations omitted).  Irrelevant or unnecessary facts do not preclude summary judgment, even when they are in dispute.  *See Anderson*, 477 U.S. at 258.

The moving party bears the initial burden of establishing that there is no genuine issue of material fact to be decided.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  With respect to any issue on which the moving party does not bear the burden of proof, it may meet its burden on summary judgment by showing that there is an absence of evidence to support the nonmoving party's case.  *See id.* at 325.  Once the movant meets this initial burden, the nonmoving party must demonstrate that there is a genuine unresolved issue for trial.  *See* Fed. R. Civ. P. 56(e).  A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"'Under New York state law, three elements must be established in order to sustain a foreclosure claim: (1) the proof of the existence of an obligation secured by a mortgage; (2) a default on that obligation by the debtor; and (3) notice to the debtor of that default.'" *Gustavia Home, LLC v. Hoyer*, 362 F. Supp. 3d 71, 79 (E.D.N.Y. 2019) (quoting *United States v. Paugh*, 332 F. Supp. 2d 679, 680 (S.D.N.Y. 2004)) (other citation omitted).  "Once the plaintiff submits

11

the mortgage, the unpaid note, and evidence of the default, it has demonstrated its *prima facie* case of entitlement to judgment." *Gustavia Home, LLC v. Bent*, 321 F. Supp. 3d 409, 414-15 (E.D.N.Y. 2018) (citing *Fleet Nat'l Bank v. Olasov*, 16 A.D.3d 374, 374 (2d Dep't 2005)).  Once the mortgagee's *prima facie* case is established, "the burden shifts to the defendant to raise a triable issue of fact, including with respect to any alleged defenses or counterclaims." *Gustavia Home, LLC v. Bent*, 321 F. Supp. 3d 409, 414-15 (E.D.N.Y. 2018) (citations omitted).

Here, as set forth in detail above, Plaintiff has submitted evidence, which the Borrower has not disputed, that establishes a *prima facie* case of entitlement to judgment pursuant to the terms of the Mortgage and Note.  In particular, Plaintiff submitted the "Loan Documents" executed by Borrower and/or Guarantors in favor of the Original Lender, the First Loan Assignment, the PSA, the Allonge, and the subsequent Assignment of Mortgage to Plaintiff.  *See E. Sav. Bank, FSB v. Thompson*, 631 Fed. Appx. 13, 15 (2d Cir. 2015) (holding that "a written assignment of the underlying note ... prior to commencement of the foreclosure action is sufficient to transfer the obligation, and the mortgage passes with the debt as inseparable incident") (citation omitted).

With regard to proof of debt, New York courts have ruled that general allegations are insufficient; instead "'[t]here must be some proof in the form of an affidavit of a person with knowledge, or a complaint verified by a person with knowledge.'" *Bent*, 321 F. Supp. 3d at 415 (quoting *Fortress Credit Corp. v. Alarm One, Inc.*, 511 F. Supp. 2d 367, 371 (S.D.N.Y. 2007)) (other citation omitted).  Here, Plaintiff submitted such evidence in the form of a declaration from Jeanna Ehlers, an Asset Manager with KeyBank Real Estate Capital, which is the Special Servicer for the subject mortgage loan.  *See* Dkt. No. 68-3.  This declaration is based on Ms. Ehlers' personal knowledge and from review of KeyBank's and Plaintiff's business records kept in

the ordinary course of business. *See id.* This declaration and attached exhibits establish that the Borrower is in default, has failed to cure that default, and supports the amounts requested, as set forth above. *See id.* In light of this uncontroverted evidence, the Court concludes that Plaintiff has established its *prima facie* case. *See Bent*, 321 F. Supp. 3d at 415.

Although the Borrower failed to submit an opposition to Plaintiff's motion for summary judgment, the Court has examined the averments and affirmative defenses raised in its answer to ensure that none of those averments and defenses raise a triable issue of fact in light of the record, and thus preclude summary judgment. *See* Dkt. No. 31. Initially, the Court notes that, although the Borrower has responded to Plaintiff's averments of default by pleading that "Defendants deny each and every allegation," such general denials are insufficient to defeat summary judgment. *See Secured Asset Mgmt., LLC v. Dushinsky*, No. 17-cv-5588, 2019 WL 4861411, *5 (E.D.N.Y. Sept. 30, 2019) (holding that "Defendants' general denials that Plaintiff has not established a *prima facie* case are insufficient").

Moreover, the only relevant affirmative defense set forth in the answer is without merit. In this affirmative defense, the Borrower alleges that by accepting payments from the Borrower following maturity, Plaintiff "created a course of conduct where Plaintiff waived any claim of foreclosure by continuing to accept payments on the note after the expiry of the term." Dkt. No. 31 at ¶¶ 51-52.

Under New York law, waiver is defined as the "voluntary and intentional relinquishment of a known right." *Cty. of Dutchess v. Argonaut Ins. Co.*, 150 A.D.3d 672, 674 (2d Dep't 2017). "[W]aiver of rights under a contract 'should not be lightly presumed,'" and therefore "a party seeking to demonstrate waiver must put forward evidence of a 'clear manifestation of intent' to

waive by the other party." *Globecon Grp., LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 176 (2d Cir. 2006) (quoting *Gilbert Frank Corp. v. Fed. Ins. Co.*, 70 N.Y.2d 966, 968 (1988)).

Here, the Borrower, as the party seeking to demonstrate waiver, has failed to put forth evidence of a clear manifestation of intent to waive by Plaintiff.  As noted above, Section 4 of the Note, entitled "Application of Partial Payments," provides as follows:

> If at any time Lender receives, from Borrower or otherwise, any amount applicable to the Indebtedness which is less than all amounts due and payable at such time, Lender may apply the amount received to amounts then due and payable in any manner and in any order determined by Lender, in Lender's discretion. **Borrower agrees that neither Lender's acceptance of a payment from Borrower in an amount that is less than all amounts then due and payable nor Lender's application of such payment will constitute or be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction.**

Dkt. No. 68-1 at ¶ 41 (emphasis added).  Similarly, Section 2.04 of the Loan Agreement, entitled "Application of Payments," provides as follows:

> If at any time Lender receives, from Borrower or otherwise, any amount applicable to the Indebtedness which is less than all amounts due and payable at such time, then Lender may apply that payment to amounts then due and payable in any manner and in any order determined by Lender (unless otherwise required by applicable law), in Lender's sole and absolute discretion. **Neither Lender's acceptance of an amount that is less than all amounts then due and payable, nor Lender's application of such payment in the manner authorized, will constitute or be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction.**  Notwithstanding the application of any such amount to the Indebtedness, Borrower's obligations under this Loan Agreement, the Note and all other Loan Documents will remain unchanged.

*Id.* at ¶ 42.

This explicit contractual language establishes that Plaintiff's acceptance of partial payment post-maturity did not reflect an intention to waive its rights caused by the Borrower's continuing

default. *See MAFCO Elec. Contractors, Inc. v Turner Const. Co.*, 357 Fed. Appx. 395, 398 (2d Cir. 2009); *Prospect Capital Corp. v. Credito Real USA Fin. LLC*, 702 F. Supp. 3d 178, 190 (S.D.N.Y. 2023) (citing cases declining to find waiver of contract provisions even though the plaintiff continued performing under the contract after the defendant had defaulted, where the plaintiff's conduct was consistent with the contract as written) (citations omitted).

In sum, the Court concludes that Borrower has failed to provide evidentiary support for its averments and affirmative defense, and no such support exists in the record. Thus, in light of the uncontroverted evidence in the record, the Court concludes that Plaintiff is entitled to summary judgment in this mortgage foreclosure action.

### 2. Attorneys' Fees

"The awarding of attorneys' fees in diversity cases such as this is governed by state law[.]" *Grand Union Co. v. Cord Meyer Dev. Co.*, 761 F.2d 141, 147 (2d Cir. 1985) (citing *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 259 n.31 (1975)). Furthermore, the Second Circuit's prerequisite for contemporaneous time records to establish the reasonableness of attorneys' fees "is expressly based on, and therefore properly construed as limited to, circumstances in which the attorney's fees were awarded pursuant to federal statute rather than through a state law mechanism such as a contract." *Nationstar Mortg. LLC v. Dolan*, No. 1:16-CV-1360, 2019 WL 1970522, *3 (N.D.N.Y. May 3, 2019). Accordingly, "in cases in which the right to attorneys' fees is governed by state law, New York's more liberal rule allowing reconstructed records should apply." *Marion S. Mishkin Law Office v. Lopalo*, 767 F.3d 144, 147-48 (2d Cir. 2014) (citing *Riordan v. Nationwide Mut. Fire Ins. Co.*, 977 F.2d 47, 53 (2d Cir. 1992)).

Under New York law, "[a]n award of an attorney's fee pursuant to a contractual provision may only be enforced to the extent that the amount is reasonable and warranted for the services actually rendered[.]" *Vigo v. 501 Second St. Holding Corp.*, 121 A.D.3d 778, 779-80 (2d Dep't 2014) (citing *Kamco Supply Corp. v. Annex Contr.*, 261 A.D.2d 363, 365 (2d Dep't 1999)). "In determining reasonable compensation for an attorney, the court must consider such factors as the time, effort, and skill required; the difficulty of the questions presented; counsel's experience, ability, and reputation; the fee customarily charged in the locality; and the contingency or certainty of compensation[.]" *Id.* (citing *Green v. Silver*, 79 A.D.3d 1097, 1098 (2d Dep't 2010)); *see also Gandy Mach., Inc. v. Pogue*, 106 A.D.2d 684, 686 (3d Dep't 1984) (affirming a reduction of "manifestly excessive" attorneys' fees from $16,052 to $2,000). New York courts have, for example, denied requests for attorneys' fees where the "plaintiff failed to substantiate the performance of certain services, to establish the time and rate for the services, and to demonstrate the reasonableness of the attorney's fees requested[.]" *Bank of New York Mellon v. Graffi*, 172 A.D.3d 1148, 1150 (2d Dep't 2019) (collecting cases).

In the present matter, as set forth above, the Loan Documents provide that the Borrower will be liable for attorneys' fees and costs associated with any default under the Note and/or judicial foreclosure action. *See, e.g.*, Dkt. No. 68-1 at ¶ 50. Thus, the Note and the Mortgage each contractually authorize recovery of reasonable attorneys' fees.

Plaintiff seeks $96,258.56 in attorneys' fees and costs for work performed from July 2023 through October 2024, comprising $88,493.30 in fees and $7,765.26 in costs. *See* Dkt. No. 68-20 at ¶ 13. According to the declaration of Raymond Quaglia, a partner with Ballard Spahr, he spent 74.4 hours on this matter and billed at an hourly rate ranging from $940.00 to $1,115.00. *See id.* Mr. Quaglia was assisted by his partner Celia Cohen, who spent 24.0 hours on this matter at an

hourly rate of $980.00, associate Facundo Bouzat, who spent 7.3 hours on this matter at an hourly

rate ranging from $720.00 to $805.00, and several paralegals, who spent a collective 19.5 hours

on this matter at hourly rates ranging from $225.00 to $310.00.  *See id.*  However, in most of the

billing invoices submitted as an exhibit to the Quaglia Declaration, the invoices indicate that the

client (Plaintiff) was given a 20% discount on the attorneys' fees charged by Ballard Spahr for

time worked on this matter by its attorneys and paralegals.  *See, e.g.*, Dkt. No. 68-25 at 3-76.

These invoices with the 20% discount begin on July 6, 2023, and continue through July 31, 2024.

*See id.*  Starting with the August 15, 2024 invoice, however, the 20% discount was no longer

applied.  *See id.* at 77-88.  Therefore, Mr. Quaglia actually charged Plaintiff an hourly rate of

primarily $752.00,[2] while Ms. Cohen, Mr. Bouzat, and the paralegals charged hourly rates of

$784.00, $576.00, and $180.00, respectively.[3]

　　　　　Although these hourly rates are higher than the rates typically found reasonable in

foreclosure matters in the Northern District of New York, the Court finds that these reduced rates

are reasonable in the present matter given the complexity of this case.  However, the rates listed at

the higher end of the ranges provided and without the twenty-percent discount are unreasonable

and the total attorneys' fees award will be reduced accordingly.  The Court further finds that the

contemporaneous billing records, which detail the nature of the work performed, establish that the

---

[2] Mr. Quaglia first started charging an hourly rate of $1,115.00 in the August 15, 2024 invoice.  *See* Dkt. No. 68-25 at 78.  Similarly, Mr. Bouzat only billed at the $805.00 hourly rate in the October 10, 2024 invoice.  *See id.* at 88.  As such, the vast majority of the attorney time and paralegal billed on this matter was at the lower hourly rates provided, and it is these lower rates on which the Court will base its attorneys' fees award.

[3] The Court notes that although the Quaglia Declaration provides the hourly rate without mentioning the twenty-percent discount provided to Plaintiff, the total amount requested ($88,493.30) in the Quaglia Declaration accounts for this discount, *i.e.*, what was actually billed to the client.

time spent on this case is reasonable.  When these reductions are factored in, the attorneys' fees award is reduced to $82,479.60.[4]

Plaintiff also seeks $7,765.26 in disbursements.  To support this request, Plaintiff has submitted contemporaneous bills detailing the disbursements, which the Court finds reasonable and appropriate.  *See* Dkt. No. 68-25 at 3, 5, 8, 30, 33-36, 53, 57.

## B.    Default Judgment

Plaintiff has also moved for default judgment against the Agency.  *See* Dkt. No. 44. Plaintiff is not seeking monetary relief against the Agency.  *See* Dkt. No. 44-2 at ¶¶ 4-5.  The Agency was included in this action because it holds a subordinate leasehold interest in the Property and Plaintiff requests that the Agency "be barred and forever foreclosed of and from all estate, right, title, interest, claim, lien and equity of redemption of, in and to the Property." *Id.* at ¶ 5 (quoting Dkt. No. 1 at 10).

"Rule 55 sets forth a two-step process that first requires the entry of a default through a notation on the record that the party has defaulted, and then entry of a default judgment, which is the final action in the case." *La Barbera v. Fed. Metal & Glass Corp.*, 666 F. Supp. 2d 341, 346 (E.D.N.Y. 2009).  The court clerk must enter the default pursuant to Rule 55(a) of the Federal Rules of Civil Procedure, "[w]hen a party against whom a judgment for affirmative relief is

---

[4] In addition to the fees listed above, the Quaglia Declaration also claims that, "[i]n addition to the invoiced amounts, Ballard Spahr has generated and continues to generate as yet unbilled fees in excess of $25,000.00 since submitting its October 2024 invoice." Dkt. No. 68-20 at ¶ 15.  The request for this additional $25,000.00 in attorneys fees is not accompanied by contemporaneous time records and the Court is therefore unable to determine whether the request is reasonable.  As such, this aspect of Plaintiff's request for attorneys' fees is denied without prejudice.

sought has failed to plead or otherwise defend, and that failure is shown by affidavit or

otherwise."  In addition, Local Rule 55.1 requires

> [a] party applying to the Clerk for a certificate of entry of default
> pursuant to Fed. R. Civ. P. 55(a) shall submit an affidavit showing
> that (1) the party against whom it seeks a judgment of affirmative
> relief is not an infant, in the military, or an incompetent person (2) a
> party against whom it seeks a judgment for affirmative relief has
> failed to plead or otherwise defend the action as provided in the
> Federal Rules of Civil Procedure and (3) it has properly served the
> pleading to which the opposing party has not responded.

N.D.N.Y. L.R. 55.1.

"After a default has been entered against a party, if that party fails to appear or otherwise

move to set aside the default pursuant to Rule 55(c), a default judgment may be entered." *La

Barbera*, 666 F. Supp. 2d at 347 (citing Fed. R. Civ. P. 55(b)).  Further procedural requisites are

imposed by Local Rule 55.2, requiring a party to submit the entry of default, a proposed default

judgment, a copy of the pleading, and an affidavit setting forth the following: (1) the party against

whom it seeks judgment is not an infant or an incompetent person; (2) the party against whom it

seeks judgment is not in the military service, or if unable to set forth this fact, the affidavit shall

state that the party against whom the moving party seeks judgment by default is in the military

service or that the party seeking a default judgment is not able to determine whether or not the

party against whom it seeks judgment by default is in the military service; (3) the party has

defaulted in appearance in the action; (4) service was properly effected under Fed. R. Civ. P. 4;

(5) the amount shown in the statement is justly due and owing and that no part has been paid

except as set forth in the statement this Rule requires; and (6) the disbursements sought to be

taxed have been made in the action or will necessarily be made or incurred.  *See* N.D.N.Y. L.R.

55.2.

In this case, Plaintiff has complied with default procedural requirements. Plaintiff submitted an application to the Clerk of the Court in compliance with the Federal and Local Rules establishing that the Agency is not an infant, in the military, or an incompetent person; the Agency has failed to plead or otherwise defend the action; and Plaintiff has properly served the pleadings to which the Agency has not responded. *See* Dkt. No. 35. Default was entered by the Clerk of the Court on February 29, 2024. *See* Dkt. No. 36.

Further, Plaintiff has complied with Rule 55(b). In support of its motion for default judgment, Plaintiff has submitted the Clerk's certificate of entry of default, a proposed form default judgment, a copy of Plaintiff's summons and complaint, and an affidavit in support of its motion. *See* Dkt. No. 44. Having found that Plaintiff has complied with the procedural requirements for a default judgment, the Court turns to the substance of Plaintiff's motion.

By failing to answer the complaint or oppose this motion, the Agency is deemed to have admitted the factual allegations in the complaint. *See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992) ("[A] party's default is deemed to constitute a concession of all well pleaded allegations of liability"); *Rolex Watch, U.S.A., Inc. v. Pharel*, No. 09-cv-4810, 2011 WL 1131401, *2 (E.D.N.Y. Mar. 11, 2011) ("In considering a motion for default judgment, the court will treat the well-pleaded factual allegations of the complaint as true, and the court will then analyze those facts for their sufficiency to state a claim"). But before entering default judgment, the Court must review the complaint to determine whether Plaintiff has stated a valid claim for relief. *See Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009).

As set forth above, Plaintiff has established that it is entitled to summary judgment in this mortgage foreclosure action. Moreover, the complaint and other evidence before the Court establishes that Plaintiff's mortgage lien is superior to the Agency's leasehold interest in the

Property. *See, e.g.*, Dkt. No. 1 at ¶ 46. Accordingly, the Court finds that Plaintiff is entitled to default judgment against the Agency. *See Dime Sav. Bank of N.Y., FSB v. Montague St. Realty Assocs.*, 90 N.Y.2d 539, 543-44 (1997) (holding that, under New York law, a mortgagee is entitled to extinguish a commercial leasehold interest that is junior or subordinate to the mortgage).

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the reasons set forth above, it is hereby

**ORDERED** that Plaintiff's motion for default judgment (Dkt. No. 44) is **GRANTED**; and it is further

**ORDERED** that judgment in mortgage foreclosure is entered in favor of Plaintiff and against the Agency on Plaintiff's complaint in mortgage foreclosure, and that the Agency, and any person or entity claiming under it, be and hereby is barred and forever foreclosed of and from all estate, right, title, interest, claim, lien and equity of redemption of, in and to the land, personal property and any other income, fixtures and articles of property at 7-9 Court Street, Binghamton, New York 13901, on which Plaintiff's first mortgage is a lien; and it is further

**ORDERED** that Plaintiff's motion for summary judgment (Dkt. No. 68) is **GRANTED**; and it is further

**ORDERED** that Judgment of Foreclosure and Sale is entered against Defendants' fee and leasehold interests and other property located at 7-9 Court Street in Binghamton, Broome County, New York (Section 160.40, Block 2, Lot 7) (the "Property") in the amount of $13,298,750.42,[5]

---

[5] In its motion, Plaintiff asks the Court to enter judgment in the amount of $13,328,884.18. This amount, however, reflects the $126,392.32 in attorneys' fees and disbursements that Plaintiff

(continued...)

with interest thereon from November 1, 2024, until the date of entry of this judgment, and additional sums as set forth below; and it is further

**ORDERED** that the Property be sold as provided by New York Real Property Actions and Proceedings Law ("RPAPL") within ninety (90) days of the date of this Judgment, by and under the direction of **Melinda A. Jahn, Esq.**, who is hereby appointed referee for that purpose (the "Referee"), in one parcel at public auction to be held on the steps of the Binghamton U.S. Courthouse at 15 Henry Street, Binghamton, New York 13901, and that the Referee shall give public notice of the time and place of sale in accordance with RPAPL § 231; and it is further

**ORDERED** that by accepting this appointment, the Referee certifies that he/she is in compliance with Part 36 of the Rules of the Chief Judge of the Supreme Court of New York, 22 NYCRR § 36.0 *et seq.* (the "Rules"), including but not limited to § 36.2(c) ("Disqualifications from appointment") and § 36.2(d) ("Limitations on appointments based upon compensation"); and if the Referee is disqualified from receiving an appointment pursuant to the provisions of the Rules, the Referee shall immediately notify this Court; and it is further

**ORDERED** that the Referee is prohibited from accepting or retaining any funds for him/herself or paying funds to him/herself without compliance with the Rules; and it is further

**ORDERED** that the Referee shall conduct the foreclosure sale only if Plaintiff, its successors and/or assigns, or its representative is present at the sale or the Referee has received a written bid and Terms of Sale from Plaintiff, its successors and/or assigns, or its representative; and it is further

---

[5](...continued)
requested.  Since the Court has reduced the requested attorneys' fees as set forth above by $30,133.76, judgment is being entered in the amount of $13,298,750.42 to reflect this reduction.

**ORDERED** that if the Referee does not conduct the sale within ninety (90) days of the date of the judgment, in accordance with CPLR 2004, the time fixed by RPAPL § 1351(1) is extended for the Referee to conduct the sale as soon as reasonably practicable; and it is further

**ORDERED** that at the time of the sale the Referee shall accept a written bid from Plaintiff or Plaintiff's attorney, just as though Plaintiff were physically present to submit said bid; and it is further

**ORDERED** that said Referee shall accept the highest bid offered by a bidder, who shall be identified upon the court record, and shall require that the successful bidder immediately execute Terms of Sale for the purchase of the Property and pay to the Referee in cash or certified or bank check ten percent (10%) of the sum bid, unless such successful bidder is Plaintiff, in which case no deposit against the purchase price shall be required; and it is further

**ORDERED** that in the event that the first successful bidder fails to execute the Terms of Sale immediately following the bidding upon the Property or fails to immediately pay the ten percent (10%) deposit as required, the Property shall immediately on the same day be re-offered at auction; and it is further

**ORDERED** that in the event a party other than Plaintiff becomes the purchaser at the sale, the closing of title shall be held no later than thirty (30) days after such sale unless otherwise stipulated by all parties to the sale, and it is further

**ORDERED** that after the Property is sold, the Referee shall execute a deed to the purchaser, in accordance with RPAPL § 1353 and the Terms of Sale, which shall be deemed a binding contract; and it is further

**ORDERED** that, if Plaintiff (or its affiliate, as defined in paragraph (a) of subdivision 1 of section six-1 of the Banking Law) is the purchaser, such party shall place the Property back on

the market for sale or other occupancy: (a) within one hundred and eighty (180) days of the execution of the deed of sale, or (b) within ninety (90) days of completion of construction, renovation, or rehabilitation of the Property, provided that such construction, renovation, or rehabilitation proceed diligently to completion, whichever comes first, provided however, that a court of competent jurisdiction may grant an extension for good cause; and it is further

**ORDERED** that the Referee, on receiving the proceeds of such sale, shall forthwith pay therefrom, in accordance with their priority according to law, all taxes, assessments, sewer rents, or water rates, which are, or may become, liens on the Property at the time of the sale, with such interest or penalties which may have lawfully accrued thereon to the date of payment; and it is further

**ORDERED** that the Referee then deposit the balance of said proceeds of sale in his/her own name as Referee in an FDIC-insured bank of the Referee's choice within the County of New York and shall thereafter make the following payments in accordance with RPAPL § 1354, as follows:

FIRST: The Referee's statutory fees for conducting the sale in accordance with CPLR 8003(b), not to exceed $750.00 unless the Property sells for $50,000.00 or more, and in the event that the sale was cancelled or postponed, Plaintiff shall compensate the Referee in the sum of $250.00 for each adjournment or cancellation, unless the Referee caused the delay;

SECOND: All taxes, assessments, sewer rents, water rates that are liens upon the Property and monies necessary to redeem the Property from any sales for unpaid taxes, assessments, or water rates that have not become absolute, and any other amounts due in accordance with RPAPL § 1354(2). Purchaser shall be responsible for interest and penalties due on any real property taxes accruing after the sale. The Referee shall not be responsible for the payment of penalties or fees

pursuant to this appointment.  The purchaser shall hold the Referee harmless from any such

penalties or fees assessed;

THIRD: The expenses of the sale and advertising expenses as shown on bills presented

and certified by the Referee to be correct, duplicate copies of which shall be annexed to the

Report of Sale;

FOURTH: The Referee shall pay to Plaintiff or its attorneys the sum of $13,298,750.42,

with interest thereon from November 1, 2024, until the date of entry of this judgment, together

with any advances as provided for in the note and mortgage which Plaintiff has made for taxes,

insurance, reasonable attorneys' fees, principal and interest and any other charges due to prior

mortgages, or to maintain the premises pending consumption of this foreclosure sale, not

previously included in the computation, upon presentation of receipts for said expenditures to the

Referee, all together with interest pursuant to the note and mortgage and then with interest from

the date of entry of this judgment at the statutory rate until the deed is transferred:

FIFTH: Surplus monies arising from the sale shall be paid into court by the Referee within

five (5) days after receipt in accordance with RPAPL § 1354(4) and in accordance with local

County rules regarding surplus monies; and it is further

**ORDERED** that if Plaintiff is the purchaser of the Property, or in the event that the rights

of the purchasers at such sale and the Terms of Sale under this judgment shall be assigned to and

be acquired by Plaintiff, and a valid assignment thereof is filed with said Referee, said Referee

shall not require Plaintiff to pay in cash the entire amount bid at said sale, but shall execute and

deliver to Plaintiff or its assignee a deed for the Property upon payment to said Referee of the

amounts specified in items marked "FIRST," "SECOND," and "THIRD" above; that the Referee

shall allow Plaintiff to pay the amounts specified in "SECOND" and "THIRD" above when

recording the deed, that the balance of the bid, after deducting the amounts paid by Plaintiff, shall be applied to the amount due Plaintiff as specified in paragraph "FOURTH" above; that Plaintiff shall pay any surplus after applying the balance of the bid to the Referee, who shall deposit it in accordance with paragraph "FIFTH" above; and it is further

**ORDERED** that all expenses of recording the Referee's deed, including real property transfer tax, which is not a lien upon the Property at the time of sale, shall be paid by the purchaser, not by the Referee from sale proceeds, and that any transfer tax shall be paid in accordance with Tax Law § 1404; and it is further

**ORDERED** that the Property is to be sold in one parcel in "as is" physical order and condition, subject to any condition that an inspection of the Property would disclose; any facts an accurate survey of the Property would show, any covenants, restrictions, declarations, reservations, easements, rights of way and public utility agreements of record, if any, any building and zoning ordinances of the municipality in which the Property is located and possible violations of same, any rights of tenants or persons in possession of the Property, prior liens of record, if any, except those liens addressed in RPAPL § 1354; any equity of redemption of the United States of America to redeem the Property within one hundred and twenty (120) days from the date of sale; any rights pursuant to CPLR 317, 2003, and 5015, or any appeal of the underlying action or additional litigation brought by any defendant or its successor or assignee contesting the validity of this foreclosure; and it is further

**ORDERED** that the purchaser be let into possession of the Property upon production in hand of the Referee's deed or upon personal service of the Referee's deed in accordance with CPLR 308; and it is further

**ORDERED** that Defendant in this action and all persons claiming through them and any person obtaining an interest in the Property after filing of the Notice of Pendency are barred and foreclosed of all right, claim, lien, title, interest in the Property after the sale of the mortgaged Property; and it is further

**ORDERED** that within thirty (30) days after completing the sale and executing the proper conveyance to the purchaser, unless the time is extended by the court, the Referee shall file with the Clerk of Court a report under oath of the disposition of the proceeds of the sale in accordance with RPAPL § 1355(1) and follow all local County rules regarding the handling of surplus monies; and it is further

**ORDERED** that if the purchaser or purchasers at said sale default(s) upon the bid and/or the Terms of Sale the Referee may place the Property for resale without prior application to the Court unless Plaintiff's attorneys shall elect to make such application; and it is further

**ORDERED** that Plaintiff shall serve a copy of this judgment upon the owner of the equity of redemption, any tenants named in this action, and any other parties or persons entitled to service, including the Referee appointed herein; and it is further

**ORDERED** that nothing herein shall be deemed to relieve Plaintiff of any obligation imposed by RPAPL § 1307 and RPAPL § 1308 to secure and maintain the Property until such time as ownership of the Property has been transferred and the deed duly recorded; and it is further

**ORDERED** that, when the Referee files a report of sale, he or she shall concurrently file a Foreclosure Actions Surplus Monies Form; and it is further

  **ORDERED** that to ensure compliance, Plaintiff shall file a written report with the Court within six (6) months from the date of entry of this judgment stating whether a sale has occurred and the outcome; and it is further

  **ORDERED** that the Clerk of the Court shall enter judgment and close this case.

**IT IS SO ORDERED.**

Dated: January 10, 2025
   Albany, New York

Mae A. D'Agostino
U.S. District Judge